**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| AMERICAN BUSINESS FINANCIAL | ) | Case No. 05-10203 (MFW) |
| SERVICES, INC., et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |

**OPINION**[1]

Before the Court is the Trustee's Motion for Entry of an
Order Authorizing the Trustee (A) to Use Funds of ABFS 2003-2
Inc. to Pay Sums Owed by ABFS 2003-2 Inc. to the Debtors as
Originators Under the 2003-2 Mortgage Loan Purchase Agreement and
(B) to Dispose of Such Funds by Making Payment of (I) the Alleged
Greenwich Secured Claim Under the Final DIP Order and (II) the
Secured Claims Held by the Debtors' Estates as Assignee of the
Patriot Deferred Payoff Secured Claim and the Clearwing Deferred
Payoff Secured Claim Under the Final DIP Order and (C) to Permit
the Debtors' Estates to Use Such Payments Received on Account of
the Patriot Deferred Payoff Secured Claim and Clearwing Deferred
Payoff Secured Claim to Pay Chapter 7 Administrative Claims (the
"Disbursement Motion"). Greenwich Capital Financial Products,
Inc. ("Greenwich"), as well as Law Debenture Trust Company of New

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, which is made applicable
to contested matters by Rule 9014 of the Federal Rules of
Bankruptcy Procedure.

York and Wells Fargo Bank, N.A. (the "Indenture Trustees") filed objections to the Disbursement Motion.  The Trustee settled the objections of the Indenture Trustees, and the Court approved that settlement.  Only the objection of Greenwich remains.  For the reasons stated below, the Court will deny the Disbursement Motion.

I.   BACKGROUND

American Business Financial Services, Inc. ("ABFS") and its subsidiaries operated as a financial services organization that originated and serviced mortgage loans, primarily in the sub-prime mortgage market to credit-impaired borrowers.  ABFS raised capital by selling pools of these loans to special purpose entities ("SPEs") created to facilitate securitization transactions.  The SPEs sold the pools of loans to mortgage trusts ("Securitization Trusts").  To raise cash for the purchase of the loans, the Securitization Trusts sold notes or trust certificates secured by the trust assets to investors.  In exchange for the loans sold to the SPEs and Securitization Trusts, ABFS received cash and certificates of beneficial interests in the Trusts that entitled it to receive certain residual cash flows generated by the Trusts in the form of interest-only strips ("I/O Strips").  ABFS often retained the right to service the pools of securitized loans for a fee.

In 2003 several subsidiaries of ABFS (the "Loan Originating
Subsidiaries"),[2] transferred a pool of loans they had originated
to ABFS Warehouse Trust 2003-2 ("Warehouse Trust") in order to
borrow money to fund the loans.  On October 31, 2003, the Loan
Originating Subsidiaries sold the mortgages held by Warehouse
Trust to a newly formed SPE, ABFS 2003-2, Inc. ("ABFS 2003-2"),
pursuant to a Mortgage Loan Purchase Agreement (the "Purchase
Agreement").  ABFS 2003-2, in turn, sold the mortgages to a
Securitization Trust, Mortgage Loan Trust 2003-2 ("Loan Trust").
Under the Purchase Agreement between the Loan Originating
Subsidiaries and ABFS 2003-2, ABFS 2003-2 was obligated to pay
the Loan Originating Subsidiaries for the pool of mortgages it
received.  As of the filing of the Disbursement Motion, the
Trustee asserts that ABFS 2003-2 still owes the Loan Originating
Subsidiaries approximately $4 million on account of that
obligation.

On January 21, 2005, ABFS and certain of its direct and
indirect subsidiaries, including the Loan Originating
Subsidiaries (collectively, "the Debtors") filed voluntary
petitions for relief under chapter 11 of the Bankruptcy Code.  On
January 24, 2005, the Debtors filed a motion seeking debtor-in-
possession ("DIP") financing, pursuant to which Greenwich agreed

_____

[2]  The Loan Originating Subsidiaries are American Business
Credit, Inc., Home American Credit, Inc., d/b/a Upland Mortgage,
and American Business Mortgage Services, Inc.

to provide a senior, secured, superpriority $500 million credit facility (the "DIP Facility") to the Debtors.[3]  The DIP Facility was secured by substantially all of the Debtors' assets.  The DIP Loan Agreement also contained broad indemnification provisions in favor of Greenwich.

Pursuant to Senior Collateralized Notes, the Indenture Trustees held a perfected lien on certain assets of the Debtors, including various I/O Strips from pre-petition securitization transactions.  Following the filing of the Petition, the Debtors sought to fund operations, in part, by using the cash generated by the pre-petition I/O Strips which were pledged to the Indenture Trustees.  In addition, the Debtors sought approval of a DIP loan from Greenwich.  To do so, the Debtors sought to prime the Indenture Trustees' interests in the pre-petition I/O Strips by granting Greenwich a first priority lien in the I/O Strips. The Indenture Trustees objected to the DIP Motion.  The parties ultimately resolved the Indenture Trustees' objection by having the Debtors provide the Indenture Trustees with adequate protection of their secured interests by means of a replacement lien, subordinate to Greenwich's DIP lien, on certain collateral including the Debtors' 100% ownership interest in ABFS 2003-2.

_____

[3] Clearwing Capital, LLC and Chrysalis Warehouse Funding, LLC (collectively, "Clearwing") and The Patriot Group, LLC ("Patriot") also had a $1 million participation in the DIP Loan.

On March 10, 2005, the Court entered a Final Order approving the DIP Loan.  Under the DIP Loan Agreement, ABFS was required to sell its fee-producing future servicing rights.  On April 4, 2005, the Court approved the terms and conditions of that sale. On the same day, the Debtors announced that a reorganization was not possible.  Shortly thereafter, on May 13, 2005, Greenwich declared a default on the DIP Loan.

As a result, the case was converted to chapter 7 and George L. Miller was appointed trustee (the "Trustee").  On July 20, 2005, the Trustee and Greenwich entered into a Conditional Consent and Undertaking (the "Consent Agreement") whereby the Trustee agreed to sell certain whole loan assets of the Debtors (which were collateral of Greenwich) pursuant to section 363 of the Bankruptcy Code.  Under the Consent Agreement, the Trustee received $300,000 of the sale proceeds for the benefit of the Debtors' estates.  The Trustee, on behalf of the Debtors, agreed to release Greenwich from certain claims.  On August 19, 2005, the Court approved the Consent Agreement.

About that time, the Trustee executed a settlement agreement with Clearwing and Patriot, which held security interests and liens on the collateral equal to Greenwich's DIP priority lien.[4] Pursuant to the settlement, Clearwing and Patriot assigned their

_____

[4]  While their liens were pari passu, on default Greenwich was entitled to payment in full before payments could be made to Clearwing and Patriot.  (Ex. T-7 § 3.03(b).)

interests to the Trustee.  The Court approved the Clearwing and Patriot settlements.

On September 13, 2006, the Trustee initiated an adversary proceeding against Greenwich and the Indenture Trustees, among others, alleging breach of contract and breach of fiduciary duty, in addition to other counts.  On February 13, 2007, the Court granted in part Greenwich's Motion to Dismiss the Trustee's Complaint.  The Trustee filed an Amended Complaint on March 13, 2007, to which Greenwich filed another Motion to Dismiss.  The Court denied Greenwich's Second Motion to Dismiss on March 20, 2008.

As activity in the adversary proceeding continued, the Trustee, on January 12, 2007, filed the Disbursement Motion.  By his Motion, the Trustee seeks to use the assets of ABFS 2003-2 to pay amounts allegedly owed by ABFS 2003-2 to the Debtors under the Purchase Agreement.  In addition, the Trustee seeks to use the funds received by the Debtors from ABFS 2003-2 to pay Greenwich's secured claims, if any, and to pay the secured claims of Patriot and Clearwing, which are held by the estate.  From the latter payments, the Trustee seeks to pay chapter 7 administrative expenses.

The Indenture Trustees and Greenwich filed objections to the Disbursement Motion on February 7, 2007.  The Court held evidentiary hearings on the Trustee's Disbursement Motion on May 29 and August 13 and 14, 2007, and the parties submitted post-

6

hearing briefs.

The Trustee ultimately settled the Indenture Trustees'
objection to the Disbursement Motion.  Over Greenwich's
objection, the Court approved the Settlement Agreement between
the Trustee and the Indenture Trustees on December 17, 2007.  In
it, the Trustee consented to the Indenture Trustees' allowed,
unsecured, superpriority administrative claim in the amount $40
million as well as their allowed general unsecured claim of $58
million.  The Trustee agreed to pay the Indenture Trustees, in
partial payment of the superpriority claim, up to $1 million from
funds received by the Debtors' estates from ABFS 2003-2.  That
Settlement Agreement provides further, however, that
disbursements will be made only after deducting "amounts owed by
the Debtors' estates to Greenwich, or to be reserved by the
Debtors' estates for the benefit of Greenwich, on account of the
indemnity claim alleged by Greenwich . . . ."

In its Limited Objection to the Disbursement Motion,
Greenwich asserted a first priority lien on all the Debtors'
assets, objected to the Trustee's proposal to pay the estate on
account of the Patriot and Clearwing claims, and objected to the
payment of chapter 7 administrative expenses before Greenwich's
potential indemnity claim is paid in full.  Greenwich further
requested that, before any distributions were made on account of
the Patriot, Clearwing, or chapter 7 administrative claims, the
funds held by ABFS 2003-2 be transferred to Greenwich as

7

collateral to secure its contingent indemnity claims.[5]   The

matter has been fully briefed and Greenwich's Limited Objection

to the Disbursement Motion is ripe for decision.


II.   <u>DISCUSSION</u>

   A.   <u>Jurisdiction</u>

   Greenwich initially contends that this Court lacks subject

matter jurisdiction over the Disbursement Motion because ABFS

2003-2 is a non-debtor entity.   The Court disagrees.   The

Trustee's Disbursement Motion proposes to collect sums owed to

the Debtors by ABFS 2003-2 and then to make distributions to

creditors such as Greenwich from those proceeds.   The Court has

jurisdiction over the Disbursement Motion because the Trustee

proposes to use funds of the estate (albeit originally held by

ABFS 2003-2), and, therefore, it is related to the "handling and

administration of the bankrupt estate."   <u>Pacor, Inc. v. Higgins</u>,

743 F.2d 984, 994 (3d Cir. 1984), <u>overruled on other grounds by</u>

<u>Things Remembered, Inc. v. Petrarca</u>, 516 U.S. 124, 134-35 (1995).

<u>See also</u> 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (E), (K), (M) &

(O).

---

   [5]   As of the hearing on the Disbursement Motion, Greenwich's
secured claim under the DIP loan had been paid in full.   (Tr. 1
at 84; Tr. 2 at 68-70; Exs. T-35, 62, 63, 64, 65.)   Greenwich
asserts a contingent unliquidated indemnity claim for any costs
and damages it suffers as a result of the adversary proceeding
filed against it by the Trustee, but has given no estimate of the
amount of that claim.   (Tr. 1 at 86; Ex. T-7 § 11.04(a).)

Further, Greenwich cannot object to this Court's jurisdiction over ABFS 2003-2 at this time, considering that the Debtors' ownership interest in ABFS 2003-2 was part of the collateral granted to Greenwich and the Indenture Trustees under the Final DIP Order.  Of course, Greenwich did not object to the Court's jurisdiction at that time.  Greenwich is, therefore, estopped from objecting to the Court's jurisdiction now.  See, e.g., Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 779 (3d Cir. 2001) ("[J]udicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency.").  Thus, the Court concludes that it has jurisdiction over the Disbursement Motion.

B.   Trustee's Action on Behalf of ABFS 2003-2

Greenwich asserts that the Trustee's endeavor to collect a debt from ABFS 2003-2 on behalf of the Debtors is beyond the Trustee's authority as sole shareholder of ABFS 2003-2 because there is no independent director acting on behalf of the SPE. Specifically, Greenwich argues that the Trustee's proposed action contravenes the corporate charter of ABFS 2003-2, which requires an independent director on the board, and is therefore void as ultra vires.  See Solomon v. Armstrong, 747 A.2d 1098, 1114 n.45 (Del. Ch. 1999) ("In the context of defining void acts, ultra vires acts fall under a much more narrow definition which includes acts specifically prohibited by the corporation's

9

charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law.")

The Court disagrees.  Greenwich's reliance on <u>Solomon</u> is undercut by the fact that, in the instant case, some "implicit authority may be rationally surmised."  The Trustee's proposal to pay the Debtors with the funds of ABFS 2003-2 on account of a debt owed by ABFS 2003-2 does not run "contrary to the basic principles of fiduciary law" and will not be rendered void. <u>Solomon</u>, 747 A.2d at 1114 n.45.  To the extent that ABFS 2003-2 owes a debt to the Debtors, the Trustee, his dual capacity notwithstanding, is authorized to oversee its payment without the appointment of an independent director.  Accordingly, the Court rejects Greenwich's assertion that the Trustee's attempt to act for ABFS 2003-2 is void as <u>ultra vires</u>.

In addition, none of the Debtors' securitization SPEs have independent directors.  The Trustee testified that when he sought to use cash collateral to pay for independent directors of the SPEs, Greenwich and the Indenture Trustees stated that it was unnecessary because the Trustee had the power to act on behalf of those subsidiaries.  (Tr. 2 at 203-04; Tr. 3 at 17-18, 30-32.)[6] As a result, no funds were approved for that purpose.  <u>See</u>

---

[6]  References to the record are: "Tr. 1" refers to the hearing held on May 29, 2007; "Tr. 2" refers to the hearing held on August 13, 2007; and "Tr. 3" refers to the hearing held on August 14, 2007.

Interim Order Authorizing Use of Cash Collateral, May, 27, 2005.

Therefore, Greenwich is judicially estopped from now asserting

that an independent director is needed.  See, e.g., Montrose, 243

F.3d at 779;  In re Integrated Health Servs., Inc., 304 B.R. 101,

109 (Bankr. D. Del. 2004) (judicial estoppel applies when a

party's position is clearly inconsistent with a prior position

that was accepted by the court, and allowing the newly

inconsistent position would create an unfair advantage).

       C.   Debts Owed to Debtors' Estates

     On the merits, Greenwich argues that the Trustee has not

proven that ABFS 2003-2 owes any debt to the Debtors.  Greenwich

contends that the Trustee has the burden of proving that ABFS

2003-2 owes a debt to the Debtors under the terms of the Purchase

Agreement, which Greenwich asserts the Trustee has failed to do.

     As evidence of the debt, the Trustee presented as a witness

Daniel Coffey, the Trustee's accountant, who testified that the

Debtors' books and records, including their June 2004 tax return,

reflected an inter-company debt owed by ABFS 2003-2 to the

Debtors.  The Trustee investigated the origin of the inter-

company debt and concluded that it arose from the obligation of

ABFS 2003-2 under the Purchase Agreement to pay for the loans

sold by the Loan Originating Subsidiaries.  After considering all

the payments made by ABFS 2003-2 to or on behalf of the Debtors,

Coffey calculated that as of the hearing date approximately $4

million was still due.  (Tr. 1 at 142; Ex. T-37, Tabs 3, 5-7; Ex.

T-38.)

Greenwich argues that the Trustee's reliance on the Debtors' books and records is misplaced.  Greenwich notes that those books and records do not even show that a debt is owed by ABFS 2003-2 to the Loan Originating Subsidiaries.  Rather, the inter-company debt accounting records reflect only that one gross amount is owed to all the other companies in the control group.  Greenwich argues that the entry may reflect an obligation ABFS 2003-2 owes to other Debtors or an obligation owed other than a debt due under the Purchase Agreement.

The Court agrees with Greenwich.  The Debtors' books and records which reflect a gross obligation due by ABFS 2003-2 to the other related companies alone is not sufficient to prove an obligation in any specific amount is owed by ABFS 2003-2 to the Loan Originating Subsidiaries.  That book entry could be anything, including the cost of services provided to ABFS 2003-2 by the Debtors.[7]  (Tr. 1 at 204;  Tr. 2 at 49.)

Further, that book entry is not even in the amount that the Trustee asserts is due under the Purchase Agreement.  The Trustee contends that at the closing on the sale of the mortgage loan pool, ABFS 2003-2 owed the Loan Originating Subsidiaries approximately $9 million.  (Tr. 1 at 144; Ex. T-37, Tabs 5-7.)

_____

[7]  Like the other SPEs, ABFS 2003-2 had no employees and had to rely on the Debtors to perform services for it including accounting, tax and other administrative tasks.

12

The Debtors' books and records at that time, however, reflected that ABFS 2003-2 owed the other entities $12.9 million. (Tr. 2 at 83-84; Ex. T-37, Tab 6.) Even if the number were the same as the debt the Trustee seeks to collect, however, the Court would not accept it as convincing evidence because the book entry is a netting of all obligations owed by and to ABFS 2003-2. The Court concludes that more is needed than just book entries to prove a debt is owed and the amount.[8]

In addition, Greenwich argues that the Debtors' books and records are not reliable. The Trustee has sued former officers and directors of the Debtors, contending in part that they falsified the Debtors' books and records. (Tr. 1 at 175, 186-88; Tr. 2 at 55-56; Tr. 3 at 90.) See also Miller v. Santilli, et al., Civ. A. No. 06-3587, 2007 WL 839981, at *1 (E.D. Pa. Mar. 15, 2007) (summarizing the Trustee's claims against the directors and officers of ABFS). Coffey testified, however, that the fraud involved in that suit did not involve the inter-company accounts in question. (Tr. 2 at 65.)

Even in the absence of evidence of fraud in the compilation of a company's books and records, however, Greenwich's expert witness, Kevin Padrick, testified that a book entry is not reliable evidence of a debt because it is subject to the

---

[8] It is for the same reason that the Court will not sustain objections to claims based simply on the fact that the claim disagrees with the debtor's books and records. More evidence is needed to overcome the prima facie validity of a proof of claim.

interpretation of the recording person.  (Tr. 3 at 183-84.)  The
best evidence of an obligation, Padrick testified, is the
original documents, including loan agreements, notes and other
evidence of debt.  (Id.)  The Court agrees.

In this case, Padrick testified that the original documents
prove that no debt is owed.  He noted specifically that the Bill
of Sale between the Loan Originating Subsidiaries and ABFS 2003-2
clearly states a purchase price of $163,993,742.16 not the
approximately $175 million that the Trustee contends was due.
(Tr. 3 at 134-36, 141; Ex. IT-56.)  Padrick testified that his
conclusion is also confirmed by a public filing made by the
Debtors shortly after closing on the sale of the loans.  (Tr. 3
at 143-45; Ex. IT-60.)

Coffey conceded that the Bill of Sale states that the
purchase price was approximately $164 million but, initially,
contended that it represented only some of the loans sold in this
transaction.  (Tr. 2 at 33, 37.)  He testified that there had to
be an additional $10 million in loans sold to ABFS 2003-2 at the
same time, in order to make the numbers work.  (Id.)  After
Greenwich's expert testified, however, Coffey conceded that the
Bill of Sale was for all of the loans sold by the Loan
Originating Subsidiaries to ABFS 2003-2.  (Tr. 3 at 199-200.)  He
testified, nonetheless, that the price for those loans was not as
represented on the Bill of Sale (which he said was only the
amount needed to pay off the prior loans on the mortgages).

14

Instead, Coffey reiterated the Trustee's argument that the purchase price to be paid by ABFS 2003-2 to the Loan Originating Subsidiaries was approximately $175 million. The Trustee's argument is premised on the assumption that the price at which the Loan Originating Subsidiaries sold the mortgage loans to ABFS 2003-2 was the same price at which ABFS 2003-2 sold the loans to the Loan Trust. (Tr. 2 at 59; Tr. 3 at 195.) He testified that this is supported by the closing sheet on the sale. (Tr. 2 at 58-59; Ex. T-37, Tab 2.)

Padrick testified that this assumption is fallacious. (Tr. 3 at 137-40.) Padrick testified that the price could not be the same for both because there were expenses involved in the sales and in the sale of the mortgage-backed certificates to the public by which the Loan Trust raised the funds ($175 million) to purchase the loans from ABFS 2003-2. (Tr. 3 at 139-40; Ex. T-37, Tab 2.) These expenses are reflected on the closing document and were deducted from the gross amount raised by the Loan Trust from the public. (Ex. T-37, Tab 2.) Padrick explained that ABFS 2003-2 was intended to be a bankruptcy-remote entity, meaning it could not be saddled with debt from its inception as the Trustee contends it was. (Tr. 3 at 145-46; Ex. IT-57 at 57-58.)

Padrick testified that the Trustee's assumption is also contradicted by the Purchase Agreement which states that the purchase price to be paid by ABFS 2003-2 is a percentage of the prices at which the Loan Trust sold the various certificates to

15

the public.  (Tr. 3 at 136-38; Ex. T-37, Tab 1 § 2.03.)  Although
the percentages were not filled in, Greenwich argues that
concluding (as the Trustee does) that the percentage has to be
100% would result in surplusage.  (Tr. 3 at 139.)

The Court agrees with Greenwich.  The Trustee's assumption
that 100% of the funds raised by the Loan Trust were to flow
through ABFS 2003-2 to the Loan Originating Subsidiaries without
reduction for any expenses is illogical and not supported by any
of the documents.  The Bill of Sale directly contradicts the
Trustee's assertion that the purchase price was $175 million;
instead it clearly states that the purchase price was
approximately $164 million.  (Ex. IT-56.)  ABFS 2003-2 paid that
sum at closing.  (Ex. T-37, Tab 2.)  The Bill of Sale is the best
evidence of what the purchase price was, and there is no evidence
that anything further is due from ABFS 2003-2 from the sale of
the loans.

The Court's conclusion is supported by rules of contract
interpretation.  If 100% of the funds raised by the Loan Trust
from the public were to be paid to ABFS 2003-2, there would have
been no reason to state the purchase price as a percentage,
resulting in surplusage in the agreement.  See, e.g., In re
Marques, 358 B.R. 188, 198 (Bankr. E.D. Pa. 2006) ("It is a
general principle of contract interpretation that in construing a
contract a court should give meaning to all its words and phrases
and adopt a construction that avoids surplusage.").  In addition,

16

the Purchase Agreement required that the purchase price be paid
in full in cash at closing.  (Ex. T-37, Tab 1 § 2.03.)  This
could not be done if the purchase price was 100% of the funds
raised from the public by the Loan Trust, as the expenses had to
be paid from those funds.  ABFS 2003-2 had no other source of
cash to pay the purchase price and the expenses at closing.  The
intent of the parties was clearly to have the purchase price be
the net funds received from the public after payment of expenses,
which could be expressed as a percentage of the funds raised from
the public once the costs were known.

    That intent is further buttressed by the fact that ABFS
2003-2 was established as a bankruptcy-remote entity.  If the
Trustee were correct that ABFS 2003-2 owed a debt of almost $10
million immediately after the closing on the sale of the loans,
the bankruptcy-remote purpose would be defeated.  <u>See generally</u>
David B. Stratton, <u>Special Purpose Entities and Authority to File
Bankruptcy</u>, 23 Am. Bankr. Inst. J. 36, 36 (2004) ("An SPE is an
entity, formed concurrently with, or immediately prior to, the
closing of a financing transaction, one purpose of which is to
isolate the financial assets from the potential bankruptcy estate
of the original entity, the borrower or originator.  Often, the
originator owns or is affiliated with the SPE, and the parties to
the transaction develop <u>elaborate procedural safeguards to ensure
that the SPE is unlikely to become insolvent</u> as a result of its
own activities and that it is adequately insulated from the

17

consequences of any related party's insolvency, thus reducing the
likelihood of the SPE's being involved in a bankruptcy
proceeding." (emphasis added)).

The Trustee asserts that it would be illogical to assume
that the Loan Originating Subsidiaries would sell their loans to
ABFS 2003-2 for less than the amount the public would pay for
certificates backed by those loans and that it could be a
fraudulent conveyance.  As noted by Padrick, however, the value
of the loans sold is not the gross amount raised, but only the
net amount after paying the expenses.  ABFS paid that net amount
to the Loan Originating Subsidiaries.  (Ex. T-37, Tab 2.)

As a result of all of the above, the Court finds that the
Trustee has failed to prove that any debt is owed to the Debtors
by ABFS 2003-2.

The Trustee may argue, however, that he can still utilize
funds of ABFS 2003-2 as its sole shareholder (perhaps by issuing
a dividend) and the authority granted to him under the Settlement
Agreement with the Indenture Trustees.  Greenwich did assert in
its Limited Objection that it "does not oppose the Trustee's
Motion to the extent it seeks to (i) pay sums owed by ABFS 2003-
2, Inc. to the Debtors and (ii) use those funds to pay the
outstanding principal and interest owing to Greenwich under the
DIP Facility." (Greenwich Ltd. Obj. ¶ 1.)  Therefore, the Court
will address the parties' arguments regarding whether any funds
should be set aside on account of Greenwich's indemnity claim

18

before any distribution can be made from the funds of ABFS 2003-2 which the estate may receive.

      D.   <u>Greenwich Indemnity Claim</u>

          1.   <u>Origin of Indemnity Claim</u>

Greenwich admits that it currently has no claim against the estate but asserts that the Trustee cannot make distributions of any money the estate receives from ABFS 2003-2 to creditors other than Greenwich until Greenwich's contingent indemnity claim is fully satisfied. It relies on section 11.04(a) of the DIP Loan Agreement, which entitles it to indemnification by the Debtors "against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against [Greenwich] . . . relating to or arising out of this Loan Agreement . . . . [including] costs and expenses incurred in connection with the enforcement or preservation of [Greenwich's] rights under this Loan Agreement . . . ." (Ex. T-7 § 11.04(a).) Greenwich further notes that the Final DIP Order dictates that Greenwich's lien remain in effect until all of the Debtors' "Obligations" under the DIP Loan Agreement, which include the indemnification obligation, are "indefeasib[ly] paid and satisfied." (Ex. T-7 § 1.01.)

The Trustee concedes that the DIP Loan Agreement grants Greenwich indemnification rights, but he insists that the indemnification liability of the Debtors will be limited or non-existent because of section 11.04(a), which provides that the

Debtors have no obligation to indemnify Greenwich for Greenwich's gross negligence or willful misconduct.

2.   Extent of Indemnification

Greenwich contends that the extent of its indemnity claim cannot be quantified until the adversary proceeding and all appeals are resolved.  (Tr. 1 at 86-87.)  Greenwich notes that it incurs attorneys' fees and costs in the adversary case on a continual basis.  Further, Greenwich argues that there is a possibility that a judgment will be entered against it which would be indemnifiable.  Consequently, Greenwich contends that it is not possible to determine the amount of its potential indemnity claim at this time.  Therefore, Greenwich argues that no funds should be used by the Trustee.

The Trustee disagrees and argues that it is possible to estimate the amount of any indemnification claim Greenwich may have and to provide Greenwich with adequate protection of that claim.  The DIP Loan Agreement provides that the Debtors have no indemnification obligation for any liability determined to have resulted from Greenwich's gross negligence or willful misconduct. (Ex. T-7 § 11.04.)  The Trustee alleges in the adversary Complaint gross negligence and willful misconduct by Greenwich, which if successful would not be indemnifiable.

Greenwich maintains, however, that several of the Trustee's claims, including the breach of contract claim, do not require the Court to find that Greenwich committed gross negligence or

willful misconduct.  It is those claims that Greenwich asserts
would, if successful, result in an indemnification claim.

The Court finds that, if the Trustee proves gross negligence
or willful misconduct, then Greenwich is not entitled to
indemnification from the Debtors.  Similarly, if Greenwich is
successful in defeating all of the Trustee's claims, no judgment
would issue against it for which it would need to be indemnified.
In the latter event, however, Greenwich would be entitled to
indemnification for all its litigation costs.  If the Trustee
succeeds on his claims for breach of contract, Greenwich could
have an indemnification claim for that judgment because no
finding of gross negligence or willful misconduct is required.
In that instance, however, the Court could simply allow Greenwich
to set off the judgment against its indemnity claim.  Therefore,
the Court concludes that Greenwich's indemnity claim for which
payment would be sought from the funds of the estate is really
limited to attorneys' fees and costs incurred in the litigation.

Because both the Disbursement Motion and the Settlement
Agreement between the Trustee and the Indenture Trustees call for
the Trustee to use the funds of ABFS 2003-2 to pay creditors
other than Greenwich before Greenwich's indemnity claim is known
or "indefeasibly paid," the Court will require that the Trustee
set aside, before any disbursement to other creditors, funds
sufficient to cover attorneys' fees and litigation costs incurred
by Greenwich in defending the Trustee's adversary action.  The

Court concludes that this escrow would provide sufficient adequate protection of Greenwich's contingent indemnity claim.

    3.   Estimation of Reserve Amount

    The Trustee offered the expert opinion of Barry Bressler, who opined as to the amount of attorneys' fees and expenses that Greenwich would expend to defend the adversary proceeding through appeals to the District and Circuit Courts.  Greenwich contends that Bressler's opinion is baseless, irrelevant, and unreliable, as he is not an "expert in complex litigation."  The Court disagrees and finds that Bressler's experience in preparing budgets and estimates of prospective litigation costs qualify him to offer his expert opinion to assist the Court.  See Fed. R. Evid. 702.

    Based on a review of invoices for litigation fees and costs rendered by counsel to Greenwich in connection with the adversary proceeding through April 17, 2007, coupled with a review of billing rates and fee applications for counsel in similarly complex cases, Bressler opined that the maximum likely cost to Greenwich to defend the adversary proceeding through appeals would be $2 million.  (Tr. 2 at 152-53.)  Greenwich contends that Bressler's calculation is flawed because he underestimated the number of attorneys Greenwich would need to staff the case, failed to anticipate the number of days and hours needed for trial, presumed that Greenwich's attorneys would work fewer hours than the Trustee's counsel (which is pursuing claims against

22

multiple defendants), failed to account for electronic discovery, and otherwise underestimated Greenwich's costs.

The Court, however, finds that Bressler's calculations are reasonable and establish a guide for the Court to follow. Significantly, Greenwich has not provided any projection of what its expenses may be.  Further, the Court notes that Greenwich is continuing to collect residual cashflows from the I/O Strips and to hold those funds and apply them to its costs as they are incurred.  (Tr. 1 at 84; Tr. 2 at 68-70; Exs. T-35, 62, 63, 64, 65.)  Therefore, the Court will direct the Trustee to establish a reserve in the amount of $2 million for Greenwich's potential indemnification claim, which should be sufficient to adequately protect Greenwich for any costs incurred in excess of the funds Greenwich is receiving from the I/O Strips.

III. <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the Trustee's Disbursement Motion.  In the event the Trustee receives any funds from ABFS 2003-2, the Trustee is ordered to place $2 million in reserve from those funds as adequate protection for Greenwich's contingent indemnity claim.

An appropriate order is attached.


Dated: April 10, 2008                    BY THE COURT:


                                         Mary F. Walrath
                                         United States Bankruptcy Judge